UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Bankr. Case No. 19-00667 |
| | ) | |
| John J. Petti and Denise A. Petti, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | Honorable Jacqueline P. Cox |
| | ) | |
| Caren A. Asher, | ) | |
| | ) | Adv. No. 19-00592 |
| Plaintiff. | ) | |
| v. | ) | |
| | ) | |
| John J. Petti, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Opinion on Amended Adversary Complaint (Docket No. 15)**

In this matter, Caren A. Asher ("Plaintiff") filed an adversary proceeding against John J. Petti

("Debtor," "Defendant," or "Defendant-Debtor") ("Amended Compl.") (Docket No. 15) alleging a

$600,000 debt owed to her by the Defendant-Debtor is non-dischargeable under 11 U.S.C. §§

523(a)(2)(A), (a)(4), and (a)(6).

The issue is whether the loan the Plaintiff made to Black Belt Brewery ("Black Belt" or "the

Brewery"), which the Debtor guaranteed, is dischargeable. The Debtor was her business partner.

The Plaintiff argues the Debtor made multiple false representations of fact to induce her to loan the

money and enter into the business. Pl.'s Pre-Trial Br., Dkt. No. 83, pp. 1-2.[1] She alleges during their

negotiations, the Debtor made the following misrepresentations: (1) Black Belt Brewery would retain

distribution rights to Cook County, Illinois; (2) the Plaintiff would be appointed a Class A member

---

[1] The Plaintiff appears to have filed duplicate Pre-Trial briefs at Dkt. Nos. 83 and 96. The court herein will cite to Plaintiff's Pre-Trial Brief at Dkt. No. 83.

of Black Belt and all decisions, including who retains distribution rights, would be reviewed by her; and (3) the Debtor would personally guarantee the $600,000 loan. *Id.* at 2. She argues based on the Debtor's representations, she was induced into loaning $600,000 and entering the business. *Id.*

The Defendant-Debtor argues the Plaintiff cannot meet her burden of proof to establish that an exception to discharge applies because she cannot show that the Defendant defrauded her, engaged in any intentional torts or violated a fiduciary duty owed to her. *See* Def.'s Pre-Trial Br., Dkt. No. 94, pp. 1-2.

### I. Jurisdiction

The court has jurisdiction to hear this matter under 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter is a "core" proceeding under 28 U.S.C. § 157(b)(2)(I), determinations as to the dischargeability of particular debts.

### II. Analysis

This case involves a brewery, Black Belt Brewery, started by the Plaintiff, the Debtor, and another individual, Mr. Mark Abraham. It was located in Illinois. The debt at issue arose when the Plaintiff gave Black Belt Brewery, LLC a $600,000 loan, which was personally guaranteed by the Debtor. Amended Compl., Dkt. No. 18, ¶¶ 1, 18; Def.'s Answer ("Answer"), Dkt. No. 16, ¶¶ 1, 18. The brewery failed around 2016 or 2017. Amended Compl., Dkt. No. 15, ¶ 34; Answer, Dkt. No. 16, ¶ 34.

The Plaintiff alleges the $600,000 debt owed to her is non-dischargeable because it was incurred by fraud (11 U.S.C. § 523(a)(2)(A)), fraud or defalcation by a fiduciary (§ 523(a)(4)), and that the Debtor wilfully and maliciously injured her (§ 523(a)(6)). 11 U.S.C. § 523(a)(2)(A), (a)(4),

2

(a)(6). Amended Compl., Dkt. No. 15, ¶¶ 39-65.

"Because bankruptcy relief is designed to give debtors a fresh start, debts are presumed to be dischargeable unless proved non-dischargeable." *In re McDougal*, 570 B.R. 798, 802 (Bankr. N.D. Ill. 2017). The objecting creditor has the burden to prove by a "preponderance of the evidence" that an exception to discharge applies.[2] *See In re McDougal*, 570 B.R. at 802 (citing *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991), *superseded by statute on other grounds*). "[E]xceptions to discharge are to be construed strictly against a creditor and liberally in favor of debtors." *In re McDougal*, 570 B.R. at 802 (citing *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)).

### 1. Section 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

"Section 523(a)(2)(A) provides three separate grounds for holding a debt to be nondischargeable: false pretenses, false representation and actual fraud." *In re Eisenstein*, 525 B.R. 428, 436 (Bankr. N.D. Ill. 2015). Here, the Plaintiff argues the Debtor made multiple false representations of fact to induce to make the $600,000 loan. Pl.'s Pre-Trial Br., Dkt. No. 83, p. 5.

### a. False Misrepresentation

To show a debt is non-dischargeable under § 523(a)(2)(A), a creditor must show "(1) the debtor made a false representation (2) that the debtor (a) knew the representation was false or made

---

[2] *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (explaining that to meet the preponderance standard, the proponent must show what he must prove is "more likely than not" to be true).

3

with reckless disregard for the truth and (b) was made with the intent to deceive, and (3) upon which

the creditor justifiably relied." *In re Eisenstein*, 525 B.R. at 436 (citing *In re Scarlata*, 979 F.2d 521,

525 (7th Cir. 1992); *Ojeda v. Goldberg*, 599 F.3d 712, 716–717 (7th Cir. 2010)). A "fraudulent

omission" can support a false representation claim. *Id.* (citations omitted). "A debtor's failure to

disclose pertinent information may be a false representation where the circumstances imply a specific

set of facts and disclosure is necessary to correct what would otherwise be a false impression." *In*

*re Eisenstein*, 525 B.R. at 436-37 (citing *In re Glenn*, 502 B.R. 516, 530 (Bankr. N.D. Ill. 2013)).

"A false representation is an express misrepresentation demonstrated either by a spoken or

written statement or through conduct." *In re Eisenstein*, 525 B.R. at 437 (citing *Nicolas & Assocs.*

*v. Morgan (In re Morgan)*, 2011 WL 3651327, at *4 (Bankr. N.D. Ill. Aug. 18, 2011)). "A debtor's

silence concerning a material fact can constitute a false misrepresentation." *Id.* (citations omitted).

Count I alleges the Debtor committed fraud under § 523(a)(2)(A) when he entered into the

distribution contract. The Plaintiff alleges that on many occasions during the negotiation of the loan,

she made it clear to the Debtor that she would not join the venture without retention of the

distribution rights over Cook County. Amended Compl., Dkt. No. 15, ¶ 40. She alleges the Debtor,

knowing it would induce her to enter the loan, made false representations that Cook County would

be retained by Black Belt and in reality, the Debtor had no intention to retain Cook County and

instead planned to sign the rights over to Mr. Mike Bryant, a friend of Mr. Abraham's who owned

a distribution company, Chicago Beer Trade (CBT). Amended Compl., Dkt. No. 15, ¶¶ 41-42.

At trial, the Plaintiff testified that in 2016, the Debtor filed the brewery's Registration

Statement, which gave CBT the right to distribute to the whole state of Illinois; she submitted an

4

email into evidence as an exhibit confirming this, but did not show who filed the statement.[3]

The Debtor denies that he had no intention of retaining Cook County. Answer, Dkt. No. 16, ¶¶ 41-42. However, he testified at trial that he "thinks" he submitted the Registration Statement and that the Plaintiff asked for a copy of the Registration Statement but he did not have a copy to give to her. He also testified the Registration Statement gave CBT the right to distribute anywhere in Illinois and all three business partners had discussed it. He testified the Distribution Agreement did not give territories or take them away and that when CBT distributed in a county, that became their territory, and they were gaining territories as they went on.

At trial, the Plaintiff testified that in January 2016, the brewery started production. The Defendant testified that in January 2016, Black Belt was not in any position to self-distribute because there was no money for employees to do so; they had not hired truck-drivers. He testified that if Black Belt was going to self-distribute in 2016, the brewery would have needed funds for marketing and advertising, which they did not have. This was when the Plaintiff stopped funding the business.

The Plaintiff testified that in 2016, the brewery started operating and the Defendant entered into the Distribution Agreement with CBT and filed the Registration Statement giving CBT the right to distribute in the entire state of Illinois, including Cook County.

The Amended Complaint states that without the retention of the rights to Cook County distribution, investors pulled out from working with Belt Belt. Amended Compl., Dkt. No. 15, ¶ 33. However, no potential investors testified that they backed out for that reason. At trial, the Plaintiff

---

[3] The Plaintiff submitted as an exhibit an email, dated April 10, 2017, purportedly sent by a Freedom of Information Officer at the Illinois Department of Revenue, that stated "[t]he territory for distribution of the Black Belt Brands by Chicago Beet [sic] Trade LLC is the entire state." Pl.'s Ex. 16: Email_170410_Rev.Foia to Asher, Dkt. No. 92.

5

and the Defendant-Debtor mentioned that other individuals who were working with them in 2016. The Plaintiff claimed these individuals were interested in investing in Black Belt, but ultimately did not do so. However, it would be hearsay to allow anyone other than the potential investors themselves to say what they thought and how their actions were motivated. *See* Fed. R. Evid. 801(c).

The Plaintiff's exhibits included two different versions of distribution agreements, Exhibit 12 and Exhibit 13. Exhibit 12 does not grant CBT distribution rights over Cook County. *See* Pl.'s Ex. 12, Distribution Agreement (BLACK BELT agreed version), Dkt. No. 92, pp. 1, Schedule 1. As discussed below, Exhibit 13 does not list Cook County as a territory in which CBT can distribute. *See* Pl.'s Ex. 13: Distribution Agreement (JOHN PETTI version), Dkt. No. 92, Ex. A, pp. 1, 16.

The Plaintiff testified that Exhibit 13 is the version of the distribution agreement that the Defendant negotiated with Chicago Beer Trade, LLC. It is dated March 17, 2016 and appears to be signed by the Debtor. *See* Pl.'s Ex. 13: Distribution Agreement (JOHN PETTI version), Dkt. No. 92, Ex. A, pp. 1, 16. She testified that she rejected the agreement at Exhibit 13 because it was unfair to the brewery; that the Defendant signed this agreement without her permission; and that she did not find out about the agreement until three months later. *See* Pl.'s Ex. 13: Distribution Agreement (JOHN PETTI version), Dkt. No. 92, Ex. A, pp. 1, 16. The Defendant testified that he "thinks" he entered the agreement in March 2016. He admitted that in June 2016, he presented the Plaintiff with a Distribution Agreement signed by the Defendant and Mike Bryant, who owned CBT. Answer, Dkt. No. 16, ¶¶ 27, 28.

Notably, the territories section of Exhibit 13 does not list Cook County as a territory over which CBT has exclusive distribution rights. *See* Pl.'s Ex. 13: Distribution Agreement (JOHN PETTI version), Dkt. No. 92, Ex. A, pp. 1, 16. It also provides that "Distributor shall not sell Brands

6

directly or indirectly to customers outside the Territory, . . . except that Distributor may sell the Brands to another distributor authorized by Brewer to handle such brands." *Id.* at p. 1. Thus, the agreement the Defendant allegedly entered does not appear to give away the brewery's rights to distribute in Cook County.

The court finds the Plaintiff has not shown that the Debtor had no intention of retaining Cook County distribution rights when the debt was incurred. She tends to argue that he improperly acted inconsistently with their business plan. However, the Debtor testified credibly that a different distribution arrangement was needed because the Plaintiff ceased making monetary contributions when they needed funds for marketing, advertising, employees, and truck drivers if they were to distribute their wares in Cook County. His testimony also indicates that he entered the agreement at a time when he believed the brewery was not in a place to self-distribute: both parties agreed he entered the agreement in March 2016 and the Plaintiff never rebutted that the brewery was not in a place to self-distribute in January 2016.

In her Pre-Trial Brief, the Plaintiff further alleges the Defendant-Debtor represented that Black Belt would be a "top-down" organization with the Plaintiff at the top. Pl.'s Pre-Trial Br., Dkt. No. 83, p. 5. The parties agreed the Plaintiff "would be the controlling member of the management team." *Id.* However, she argued the Defendant previously testified he had no understanding of this operating agreement and that while he understood it was supposed to be run with Plaintiff at the helm, the company was managed as a "free for all." *See* Pl.'s Pre-Trial Br., Dkt. No. 83, p. 5; Pl.'s Ex. 5: Interrog. Excerpt (P.2): Petti Dep. 18–21, Aug. 13, 2022, Dkt. No. 92.[4]

---

[4] Plaintiff's Exhibit 5 was admitted into evidence. At the August 16, 2022 trial, Plaintiff's counsel clarified that the exhibit was from the August 13, 2022 Deposition of the Defendant.

At the trial, the Plaintiff's counsel asked the Defendant about the following deposition testimony:

The Plaintiff suggests the Defendant's statement about the "free for all" means he was dishonest about her being in charge. At trial, the Defendant-Debtor testified that when he called the brewery a "free for all," he meant each business partner "did whatever it took to try to get things done." The court sees the "free for all" comment akin to saying "all hands on deck": everyone did what they could to get things done because the Plaintiff was clearly not always around to be at the helm. It is hard to say that the Debtor doing things in her absence amounted to fraud. She testified that she lives in New York; she was not always around in Illinois, where the brewery was located.

She also alleges that he did not intend to pay back the loan, which the Defendant denies. Amended Compl., Dkt. No. 15, ¶ 47; Answer, Dkt. No. 16, ¶ 47. She has submitted no evidence that he never intended to pay it back at the loan's inception or afterwards. In fact, he spent over a year uncompensated working diligently towards getting this business going.

The court finds the Plaintiff failed to show that the Debtor made false representations that the brewery would retain distribution rights over Cook County and that Black Belt would be a "top-down" organization with Plaintiff at the top, especially since she lives in New York; she was not in Illinois at all relevant times. *See In re Eisenstein*, 525 B.R. at 437. Regarding the self-distribution issue, there appears to be a misunderstanding between the parties about whether Plaintiff's Exhibit 8 was a business Plan. The Debtor testified that Plaintiff's Exhibit 8, which she claimed was a

---

Q:    Okay. So you had authority to make decisions as to what the [licensing registration] paperwork said?
A:    Uh-huh.
Q:    Okay. And so – You were doing that on your own without any review without by [sic] Ms. Asher or Mr. Abraham because there was so much?
A:    I don't really recall any instance, you know. I mean, I'd have to – it's a long time ago.
Q:    Yeah, I know. So there wasn't – Was there a process of any – there wasn't a review process?
A:    We didn't have a process, no.
Q:    It was more of a free-for-all?
A:    Get this done, get it done.

*See* Pl.'s Ex. 5: Petti Deposition Excerpt (P. 21:18 – 21), Dkt. No. 92; Petti Dep. 18:22–24, 19:1–10, Aug. 13, 2022.

8

business plan stating that the brewery would self-distribute, was just an "idea." *See* Pl.'s Ex. 8:

Black Belt Business Plan, Dkt. No. 92.

The plan says their growth strategy includes self-distributing. *Id.* at p. 8. Unfortunately, they

did not have personnel in place to do so.

He testified the brewery was supposed to hire the Plaintiff's brother, Francine, who was

going to work with Mr. Abraham, but Francine backed out and the brewery ended up hiring a

distributor. The court notes that the signed guaranty submitted by the Plaintiff does not mention self-

distribution. Pl.'s Ex. 15: Personal Guaranty, Dkt. No. 92.

The Plaintiff testified that the Debtor went "behind her back" and negotiated and signed a

Distribution Agreement with Mike Bryant. Based on the Debtor's testimony, it appears he

negotiated a distribution agreement with Mr. Bryant, the owner of CBT; he testified that he discussed

the  deal he got from CBT (which was 5% less than what other distributors were charging) with the

Plaintiff but it is unclear if he did so before it was signed. The Plaintiff submitted as an exhibit a

Distribution Agreement between Black Belt and CBT, dated March 17, 2016, which is signed by the

Debtor, but does not give CBT distribution rights over Cook County. *See* Pl.'s Ex. 13: Distribution

Agreement (JOHN PETTI version), Dkt. No. 92, Ex. A, pp. 1, 16. The Debtor also testified that in

January 2016, it would not have been possible for Black Belt to self-distribute. The Plaintiff failed

to show that Debtor made a false representation regarding Cook County distribution rights, given

the fact that distribution rights over Cook County were not mentioned in the Plaintiff's exhibits, the

guaranty and the Distribution Agreement. *See* Pl.'s Ex. 15: Personal Guaranty, Dkt. No. 92.

Regarding her second argument, since the parties disagree about what rights the Plaintiff had

as a Class A member, she cannot show by preponderance of the evidence that the Debtor

9

misrepresented how the business would be run. The Plaintiff argues (and the Debtor disputes) that under the Operating Agreement, she had a "right of first refusal on all contracts" and all decisions, including who retains distribution rights, would be reviewed by her. Amended Compl., Dkt. No. 15, ¶ 16, 20; Answer, Dkt. No. 16, ¶¶ 16, 20. As mentioned herein, the Plaintiff resided in New York; it is not clear that she was on the premises enough to exercise her "right of first refusal."

Moreover, assuming arguendo the Plaintiff had (1) a "right of first refusal on all contracts" and (2) a right to review all decisions, including who retains distribution rights, under the Operating Agreement, and the Defendant entering the agreement with Mr. Bryant violated the agreement, the Defendant's breach of contract would not be sufficient to show fraud under § 523(a)(2)(A). "The Seventh Circuit has noted that 'failure to honor one's promise is (just) breach of contract, but making a promise that one intends not to keep is fraud." *In re McDougal*, 570 B.R at 803 (citing *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005)); *see also In re Eisenstein*, 525 B.R. at 440 (citing *In re Oakley*, 503 B.R. 407, 433 (Bankr. E.D. Pa. 2013)). The Plaintiff cannot show that the Defendant never intended to keep these promises when the promises were made.

Since the court finds that the Plaintiff cannot show the Debtor made a false representation, the court will not discuss the elements of reliance or intent.

### 2. Section 523(a)(4)

Section 523(a)(4) excepts from discharge debts incurred by "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). To prevail under § 523(a)(4), the plaintiff must prove that the debtor: "(1) committed a fraud or defalcation while acting as a fiduciary; (2) embezzlement; or (3) larceny." *In re Wians*, 523 B.R. 124, 129 (Bankr. N.D. Ill.

10

2014).

Here, the Plaintiff relies on the first prong under § 523(a)(4), fraud or defalcation. To prove a claim for defalcation, the plaintiff must show "(1) the debtor acted as a fiduciary to the creditor at the time the debt was created, and (2) that the debt was caused by fraud or defalcation." *In re Wians*, 523 B.R. at 130 (citing *In re Berman*, 629 F.3d 761, 766 (7th Cir. 2011)). For purposes of § 523(a)(4), fraud "requires intentional deceit." *In re Bauman*, 461 B.R. 34, 45 (Bankr. N.D. Ill. 2011). To find a debt is nondischargeable under § 523(a)(4), it is "essential" that a court find "the debtor was acting in a fiduciary capacity at the time the debt arose." *In re Kohler*, 255 B.R. 666, 667 (Bankr. E.D. Pa. 2000).

The Plaintiff argues that a cornerstone of the brewery's business plan was retaining Cook County distribution rights and that she made it clear to Defendant and their other partner that this was a non-negotiable condition of her coming into the business. *See* Pl.'s Pre-Trial Br., Dkt. No. 83, p. 7. She argues the Defendant breached his fiduciary duty under § 523(a)(4) when he gave away the Cook County distribution rights by deception and negligence. *Id.* at p. 8. She argues he showed her a distribution agreement that permitted Black Belt to retain the Cook County distribution rights. *Id.* However, there was another distribution agreement that gave those rights to CBT, and the Defendant filed a copy of this agreement with the Illinois Liquor Commission. *Id.* The court asked about this at trial but did not get a clear answer.

### a. Fiduciary Relationship

"'[A] fiduciary relationship under state law in a corporate context does not a 'fiduciary' under 11 U.S.C. § 523(a)(4) make.'" *In re Jahelka*, 442 B.R. 663, 670 (Bankr. N.D. Ill. 2010), *abrogated on other grounds* (citing *Martello v. Fowers (In re Fowers)*, 360 B.R. 888, 896

11

(Bankr.N.D.Ind.2007). Section 523(a)(4) does not apply to fiduciary relationships implied from contract. *See In re Frain*, 230 F.3d 1014, 1018 (7th Cir. 2000) (citing *LSP Inv. P'ship v. Bennett* (*In re Bennett*), 989 F.2d 779, 784 (5th Cir.1993)). Whether a fiduciary relationship exists under § 523(a)(4) is a matter of federal law. *In re Wians*, 523 B.R. at 130 (citing *In re Berman*, 629 F.3d at 767).

A plaintiff must show, by a preponderance of the evidence, that an express trust or a fiduciary relationship exists and that a debt was caused by the debtor's fraud of defalcation. *Id.* (citations omitted). For the purposes of § 523(a)(4), a "fiduciary relationship" is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *Id.* (citing *In re Frain*, 230 F.3d at 1017).

For § 523(a)(4) purposes, the Seventh Circuit has recognized a fiduciary relationship in two circumstances: "an express trust and an implied fiduciary relationship." *In re Sanchez*, No. 19BK32364, 2021 WL 5893993, at *3 (Bankr. N.D. Ill. Dec. 13, 2021) (citing *In re Berman*, 629 F.3d at 768). Here, there is no express trust.

An implied fiduciary relationship may arise where the relationship "involved a difference in knowledge or power giving one party a position of ascendancy over the another." *See In re Sanchez*, 2021 WL 5893993, at *3 (citing *Matter of Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994)). These "relations of inequity . . . justify the imposition on the fiduciary to treat his principal's affairs with all the solicitude that he would accord to his own affairs" because the relationship requires the "principal to repose a special confidence in the fiduciary." *See In re Sanchez*, 2021 WL 5893993, at *3 (citing *Matter of Marchiando*, 13 F.3d at 1116; *In re Frain*, 230 F.3d at 1017). In the Seventh Circuit, "[j]oint venturers or general partners who are in equal positions generally do not have a

12

fiduciary duty towards each other for the purposes of § 523(a)(4)." *See In re Liebl*, 434 B.R. 529, 540 (Bankr. N.D. Ill. 2010) (citing *In re Woldman*, 92 F.3d 546, 547 (7th Cir.1996)).

Under this test, a "fiduciary duty" covers circumstances which, although not involving a literal trust, call for the application of "the same high standard." *In re Frain*, 230 F.3d at 1017. These include the lawyer-client, director-shareholder, or managing partner-limited partner relationship. *Id.* (citing *Marchiando*, 13 F.3d at 1115-16). In *In re Frain*, for instance, directors of a corporation sued the Chief Operating Officer, alleging debts owed to them from their business relationship were non-dischargeable. *Id.* at 1015-16. The court found the Debtor's "superior knowledge of day-to-day operations" was not enough by itself to show a fiduciary duty; however, a fiduciary relationship was created by the structure of the corporation under the shareholder agreement, which created an extremely one-sided concentration of power. *Id.* at 1016-19. The Debtor had "ultimate power over both his employment and the direction of the corporation" as the majority shareholder who could not be removed for cause without his consent. *Id.* at 1018-19.

The Plaintiff tends to argue that the Debtor owes her a fiduciary duty under corporate law and by giving away the Cook County distribution rights, he breached his fiduciary duty to Black Belt. *See* Pl.'s Pre-Trial Br., Dkt. No. 83, pp. 6, 8. However, as mentioned above, even if a fiduciary relationship exists under state corporate law, this does not mean a fiduciary relationship exists under § 523(a)(4).

Here, instead, to determine whether a fiduciary relationship exists under § 523(a)(4), the court must determine whether there was an implied fiduciary relationship by determining if there was "a difference in knowledge or power" giving the Debtor "a position of ascendancy" over the Plaintiff. *See In re Sanchez*, 2021 WL 5893993, at *3 (citing *Matter of Marchiando*, 13 F.3d 1111,

13

1116 (7th Cir. 1994)). Here, similar to *In re Frain*, the Debtor had "superior knowledge of day-to-day operations." 230 F.3d at 1017. The Plaintiff testified that she lived in New York while the brewery was being developed and while it was operating. She spent some time working at the brewery. She appointed the Debtor, who resided in Illinois where the brewery was located, to run the day-to-day operations of Black Belt; he handled manufacturing, production, and inventory and management issues. Amended Compl., Dkt. No. 15, ¶ 21; Answer, Dkt. No. 16, ¶ 21. Thus, clearly the Debtor had extensive responsibilities.

However, unlike *In re Frain*, the Debtor had considerably less power under the parties' operating agreement. 230 F.3d at 1017. The Debtor testified that the Plaintiff had the authority to fire and hire employees and they both agree she was the only Class A member. The Plaintiff argues that under the Operating Agreement, she had a "right of first refusal on all contracts" and all decisions, including who retains distribution rights, would be reviewed by her. Amended Compl., Dkt. No. 15, ¶¶ 16-20. The Debtor disputes this, claiming the Plaintiff did not have the ability to review "all contracts," but has not disputed that she was the only interest-holder with voting rights. Answer, Dkt. No. 16, ¶¶ 16-20. The evidence suggests the Plaintiff had more power under the contract than the Debtor. She clearly had at least as much power as him, indicating the Debtor did not have a fiduciary duty toward her for § 523(a)(4) purposes. *See In re Liebl*, 434 B.R. at 540 (citing *In re Woldman*, 92 F.3d at 547). For that reason, this case does not present special circumstances in which an implied fiduciary relationship exists. The Plaintiff has not met her burden to show, by a preponderance of the evidence, that a fiduciary relationship exists and that a debt was caused by the debtor's fraud or defalcation. *See In re Wians*, 523 B.R. at 130 (citing *In re Berman*, 629 F.3d at 767).

14

### b. Debts Incurred by Fraud or Defalcation

For the purposes of the Bankruptcy Code's exceptions to discharge, the Supreme Court has interpreted "fraud" to mean "positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement; and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 267 (2013) (citing *Neal v. Clark*, 95 U.S. 704, 709 (1877)). The Supreme Court further stated that "[w]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, 'defalcation' requires an intentional wrong." *Id.*

"Defalcation" occurs when a party misappropriates funds held in trust for another in any fiduciary capacity and fails to properly account for such funds. *In re Bauman*, 461 B.R. at 45. "Defalcation has also been defined as 'a failure to account for money or property that has been entrusted to another.'" *In re Wians*, 523 B.R. at 130 (citing *In re Hanson*, 432 B.R. 758, 775 (Bankr. N.D. Ill. 2010)). The Supreme Court has held that a finding of defalcation under § 523(a)(4) includes a culpable state of mind requirement "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *See Bullock*, 569 U.S. at 269.

Since the Plaintiff cannot show a fiduciary relationship existed by a preponderance of the evidence, the court will not discuss whether the element of "fraud" or "defalcation" is met. She cannot prevail on her § 523(a)(4) claim.

### 3. Section 523(a)(6)

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The Supreme Court has held an exception to discharge under § 523(a)(6) requires "a deliberate or intentional

injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Courts define "malicious intent" under § 523(a)(6) as "something done in conscious disregard of one's duties or without just cause or excuse." *In re Eisenstein*, 525 B.R. at 440 (Bankr. N.D. Ill. 2015) (citing *Larsen v. Jendusa-Nicolai (In re Larsen)*, 442 B.R. 905, 914 (E.D. Wisc. 2010)).

The Plaintiff makes the same argument to support her § 523(a)(6) claim that she made to support her § 523(a)(4) claim. She additionally argues that, by filing the copy of the Registration Statement that gave the brewery's right to distribute beer in Cook County to CBT, the Defendant's acts constituted malice because he "served the interests of his long-time friend and violated his fiduciary duty to Black Belt." *See* Pl.'s Pre-Trial Br., Dkt. No. 83, p. 8.

Based on the Defendant's testimony, it is unclear if his act in filing the Registration Statement was an intentional act. He testified that he did not remember filing it but "probably" did. Regarding the Distribution Agreement, the Defendant testified that he thought he was getting a "good deal" and discussed this deal with his business partners, although it's unclear if he discussed it with the Plaintiff before entering into it. The Defendant also disputes that the Plaintiff had the ability to approve any and all contracts, although the Plaintiff contends the Operating Agreement gave her such a right. Amended Compl., Dkt. No. 15, ¶ 20, Ex. C (citing Art. V., Section 5.1 of the Operating Agreement); *see also* Pl.'s Ex. 3: Operating Agreement Excerpt (Article V), Dkt. No. 92. The Debtor allowed CBT to distribute in Cook County because the brewery did not have sufficient personnel or funds for marketing, for an ad campaign or to hire employees to distribute the beer. As a result, the Plaintiff does not show a "deliberate or intentional injury." The Debtor may have breached the Operating Agreement. However, breach of contract does not justify a non-

16

dischargeability judgment. *In re Oakley*, 503 B.R. at 433.

## IV. Conclusion

For the reasons discussed above, the court hereby rules in favor of the Defendant on all counts.

This opinion represents the court's findings of fact and conclusions of law. A separate judgment will be entered.

*Jacqueline P. Cox*

**Date**: August 31, 2022

**ENTER**: _____
U.S. Bankruptcy Judge
Jacqueline P. Cox

17